## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **FRANCES B. CITARELLI,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07cv00069 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security**, | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.


*I. Background and Standard of Review*


Plaintiff, Frances B. Citarelli, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2008).  Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 1:07-cv-00069-PMS   Document 30   Filed 06/05/08   Page 1 of 31   Pageid#: 517

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Citarelli protectively filed a prior SSI application on March 27, 2003. (Record, ("R."), at 34.) This claim was denied initially and on reconsideration. (R. at 34.) By decision dated May 27, 2004, Citarelli's claim was denied, and she pursued it no further. (R. at 34-43.) She protectively filed her current SSI application on September 30, 2004, alleging disability as of August 1, 2002, based on neck and back pain, a right arm injury, fatigue and depression. (R. at 77-81, 103, 111, 139.) Citarelli's claim was again denied both initially and on reconsideration. (R. at 46-48, 51, 52-54) She then requested a hearing before an administrative law judge, ("ALJ"), which was held on March 27, 2006, and at which Citarelli was represented by counsel. (R. at 55, 411-51.)

By decision dated April 17, 2006, the ALJ denied Citarelli's claim. (R. at 17-26.) The ALJ found that Citarelli had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 19.) The ALJ found that the medical evidence established that Citarelli had severe impairments, namely a back disorder, hypertension, hyperlipidemia, gastroesophageal reflux disease, ("GERD"), depressive

-2-

disorder, post-traumatic stress disorder, ("PTSD"), generalized anxiety disorder and a history of headaches, but he found that Citarelli did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-22.) The ALJ found that Citarelli had the residual functional capacity to perform a significant range of light work[1] that allowed for occasional bending, stooping and crawling, but he found that she should avoid climbing, heights, moving machinery, contact with the public and complex/detailed tasks. (R. at 23.) Although the ALJ found that Citarelli could return to her past relevant work as a packer, he further found that she could perform the jobs of an office cleaner, a food preparation worker, a survey worker and a telemarketer, all at the light level of exertion. (R. at 25-26.) Therefore, the ALJ concluded that Citarelli was not under a disability as defined in the Act, and that she was not eligible for SSI benefits. (R. at 26.) *See* 20 C.F.R. § 416.920(f)-(g) (2007).

After the ALJ issued his opinion, Citarelli pursued her administrative appeals, (R. at 12), but the Appeals Council denied her request for review. (R. at 6-9.) She then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2007). The case is before this court on Citarelli's motion for summary judgment filed February 21, 2008, and the Commissioner's motion for summary judgment filed March 18, 2008.

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2007).

Citarelli was born in 1965, (R. at 78, 419), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education and past relevant work experience as a cashier, a factory worker and a motel housekeeper. (R. at 140, 145, 419.)

Citarelli testified at her hearing that she last worked part-time in 1996 as a packer in a factory, but had to quit working due to her depression and worries about her children. (R. at 419-20.) Citarelli further testified that she had worked part-time as a "team leader" at a fast food restaurant in 1992. (R. at 421.) Citarelli testified that she "stay[ed] depressed," noting that she began receiving treatment for depression in 2002, but had always been depressed. (R. at 424.) She stated that she suffered from depression due to her "bad history [she had] had throughout life." (R. at 424.) She testified that she had no energy as a result of medication side effects and that she experienced crying spells three to four times weekly. (R. at 424-25.) Citarelli further testified that she did not like being around crowds, noting that it caused her heart to race. (R. at 425.) She stated that she had no friends and had thoughts of suicide once or twice monthly. (R. at 425-26.) Citarelli testified that she received treatment from

---

[2]Because Citarelli's arguments on appeal challenge only the ALJ's findings with regard to her alleged mental impairments, the only facts contained in this Memorandum Opinion are those relevant to the ALJ's findings related thereto. Any other facts contained in the Memorandum Opinion are for clarity of the record only. Moreover, because Citarelli filed a prior application for SSI on March 27, 2003, which was denied by decision dated May 27, 2004, and which Citarelli pursued no further, this prior decision is *res judicata*. That being the case, the question before the court is whether Citarelli was disabled at any time between May 28, 2004, the day following the date of the prior denial, and April 17, 2006, the date of the current ALJ's denial. I note that any medical evidence included in this Memorandum Opinion not directly relevant to this time period is included for clarity of the record only.

Dr. Gee, a psychiatrist, every three months for medication and that she saw a social worker monthly for counseling. (R. at 426.) She stated that she had suffered from PTSD for four to five years, noting that she was verbally and sexually abused by various individuals throughout her childhood. (R. at 426-27.) Citarelli further stated that she learned in 2001 or 2002 that her ex-husband also had verbally and sexually abused their daughter. (R. at 427-28.) She stated that, as a result, she did not want to be around people and could not trust people. (R. at 428.) Citarelli stated that she had received treatment for her PTSD from Dr. Gee since approximately 2002, noting that medication took the edge off. (R. at 428.) She testified that, before she learned of the abuse of her daughter, she blocked out memories of her own abuse, but that it "c[a]me back to haunt [her]." (R. at 429.) Citarelli stated that she also had been diagnosed with generalized anxiety disorder, which she had experienced for a long time, but which she did not realize was a condition. (R. at 429.) She testified that stressful situations worsened her anxiety. (R. at 429.) She stated that her heart would race, she would get a nervous feeling in her stomach and she would feel short of breath. (R. at 429.) Citarelli further testified that she often had difficulty concentrating. (R. at 429.) She stated that she was taking Seroquel, Paxil and Cymbalta. (R. at 426.)

Citarelli testified that she did not get dressed approximately four days out of the week. (R. at 433.) She stated that she could take care of her personal needs, and she stated that she awakened her children, ages 16, 11 and 10, to get ready for school, but that they were old enough to get themselves ready. (R. at 418, 433.) Citarelli stated that, after her children left for school, she would lie down. (R. at 434.) She testified that her daughter completed most of the household chores, but that she sometimes vacuumed and dusted a little bit. (R. at 434.) Citarelli testified that she would prepare

-5-

something "easy" for lunch and that her daughter performed a lot of the evening cooking. (R. at 434.) She stated that she would lie back down after dinner. (R. at 434.) Citarelli stated that she did not attend church services or engage in any type of school activities with her children, stating that she usually had them ride with a friend. (R. at 434.) She stated that she would accompany her daughter and her aunt to grocery shop, but that her daughter prepared the shopping list. (R. at 434-35.) Citarelli testified that her mother paid her bills due to her forgetfulness. (R. at 435.) She stated that she had no energy during the day, that she did not visit others and that she had no hobbies. (R. at 435.) Citarelli testified that she could drive, but "very seldom" did because she had been involved in a motor vehicle accident that left her feeling "paranoid" when she drove. (R. at 417.) Citarelli stated that the longest trip she had taken since her onset of disability was to Maryland the previous summer. (R. at 437.) However, she stated that she had to stop eight to 10 times. (R. at 437.)

Robert Jackson, a vocational expert, also was present and testified at Citarelli's hearing. (R. at 443-49.) Jackson classified Citarelli's past relevant work as a packer as light and unskilled and her work as a team leader at a fast food restaurant as medium[3] and semiskilled. (R. at 443-44.) Jackson was asked to consider a hypothetical individual of Citarelli's age, education and work history, who could perform light work diminished by an ability to use the right hand only occasionally to manipulate hand controls and by a marked restriction on the ability to relate to co-workers, to take instruction or criticism or relate to supervisors or the public. (R. at 444-45.) Jackson testified that such an individual could perform the light jobs of an

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2007).

office cleaner and a food preparation worker, which were simple and unskilled and did not require public contact. (R. at 445.) When Jackson was next asked to consider the same hypothetical individual, but who also was markedly limited in her ability to maintain concentration, persistence and pace, he stated that such an individual would not be able to perform the enumerated jobs. (R. at 445.) Jackson was then asked to consider the first hypothetical individual, but who was markedly limited in her ability to handle work stresses. (R. at 445-46.) Jackson testified that such an individual would be able to work. (R. at 446-47.)

Jackson was next asked to assume the first hypothetical individual, but who was restricted to the performance of sedentary work.[4] (R. at 447.) He stated that such an individual might be able to perform the jobs of a telephone survey worker and a telemarketer, depending on whether her inability to deal with the public extended to telephone contact. (R. at 447-48.) Jackson testified that he needed additional information to answer that question. (R. at 448.) Jackson further testified that the same individual, but who was markedly restricted in her ability to maintain attention, concentration and pace could not perform the sedentary jobs enumerated. (R. at 448.) Likewise, Jackson testified that the first hypothetical individual, restricted to light work, who also had to lie down for up to one hour daily could not perform any jobs. (R. at 448.) Jackson further testified that the first hypothetical individual who also had to miss two days of work per month would not be able to perform the jobs enumerated. (R. at 448.)

_____

[4]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items such as docket files, ledgers and small tools. *See* 20 C.F.R. § 416.967(a) (2007).

In rendering his decision, the ALJ reviewed records from Buchanan General Hospital; Dr. H.J. Patel, M.D.; Cumberland Mountain Community Services; University of Virginia; Dr. Zaven Jabourian, M.D.; Buchanan Orthopaedics; Clinch Valley Medical Center; Dr. Mrugendra R. Patel, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Mark S. Clem, P.A.; Dr. Minaben D. Patel, M.D.; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; and Dr. Richard M. Surrusco, M.D., a state agency physician.

Citarelli saw Dr. Gee, M.D.,[5] a psychiatrist at Cumberland Mountain Community Services, ("CMCS"), on May 10, 2004, complaining that her medications were not working. (R. at 186.) He noted that her mood was sarcastic and irritable, and her judgment and insight were poor. (R. at 186.) Citarelli's concentration and memory were deemed fair. (R. at 186.) Dr. Gee diagnosed PTSD, chronic, major depressive disorder and a history of noncompliance. (R. at 186.) He increased Citarelli's dosage of Remeron. (R. at 186.) Dr. Gee indicated that Citarelli had made little progress thus far, but that he would continue trying with medications and counseling. (R. at 186.) On June 7, 2004, Citarelli rescheduled her appointment with Gail Herring, an RN at CMCS. (R. at 190.) On June 24, 2004, Herring noted that she had not yet seen Citarelli. (R. at 238.) Herring noted that Citarelli needed better compliance. (R. at 238.) On June 29, 2004, Citarelli saw Herring, who assessed a depressed mood and blunted affect. (R. at 189.) Citarelli stated that her medication was not helping her, and she reported poor concentration. (R. at 189.)

On July 2, 2004, Citarelli saw Dr. M.R. Patel, M.D., noting continued anxiety

---

[5]There is no mention of Dr. Gee's first name contained in the record.

-8-

and depression. (R. at 278.) Dr. M.R. Patel noted that Citarelli's comprehension was intact and she was diagnosed with chronic anxiety-depression. (R. at 278.) On July 20, 2004, Citarelli missed her appointment. (R. at 188.) On July 22, 2004, Dr. H.J. Patel, M.D., Citarelli's primary care physician, noted that Citarelli had depression, for which she was receiving treatment at CMCS. (R. at 162.) After missing her July appointment, Herring called Citarelli and described her mood as "ok." (R. at 185, 188.) In August 2004, Citarelli missed her appointment with Dr. Gee and with Herring, stating that she had forgotten about them after she and her daughter were involved in a motor vehicle accident. (R. at 182-84.) Citarelli reported being in a "grouchy" mood, but she stated that she was taking her medications as directed. (R. at 182.) On August 20, 2004, at Citarelli's request, Dr. H.J. Patel referred her to Stone Mountain Mental Health Clinic. (R. at 161.) On August 23, 2004, Citarelli reported occasional anxiety, and she stated that she had been "less moody." (R. at 181.) Her diagnoses and medications remained unchanged. (R. at 181.) On September 17, 2004, Herring indicated that Citarelli remained psychiatrically stable, but needed better compliance. (R. at 237.) That same day, Dr. H.J. Patel noted that Citarelli was "following at Stone Mt. Mental [H]ealth [C]linic." (R. at 160.)

When Herring called Citarelli on September 21, 2004, to remind her of her appointment Citarelli stated that she could not come because she and her children had dentist appointments. (R. at 179.) Citarelli further informed Herring that she would be seeing a counselor at Stone Mountain soon because CMCS had not done anything for her in two years and had not helped her to receive SSI benefits. (R. at 179.) The following day, Citarelli had a depressed mood/affect. (R. at 178.) She reiterated that she wished to begin counseling at Stone Mountain. (R. at 178.) Herring noted that

she had to call Citarelli most of the time to remind her of her appointments. (R. at 178.) On October 12, 2004, Citarelli missed her appointment. (R. at 177.) It was again noted on more than one occasion in October 2004, that Citarelli was suffering from PTSD and major depressive disorder. (R. at 222, 226-27.) On October 14, 2004, Citarelli reported anxiety, difficulty concentrating and an inability to work. (R. at 344.) Dr. H.J. Patel diagnosed generalized anxiety disorder with panic attacks, among other things. (R. at 344.) On October 21, 2004, Dr. H.J. Patel completed a "Medical Evaluation," concluding that Citarelli would be unable to work for at least 90 days, partially due to her depression. (R. at 173-74.) Dr. H.J. Patel noted that Citarelli had been compliant with treatment and that her condition did not hinder her ability to care for her children. (R. at 174.) He opined that Citarelli would require additional evaluation and/or assessment to determine her current and/or future work capacity, specifically, that of a medical specialist. (R. at 174.) On October 27, 2004, Herring noted that she attempted to call Citarelli several times, but to no avail. (R. at 176.)

On October 28, 2004, Citarelli saw Dr. M.R. Patel, who again diagnosed her with chronic anxiety-depression. (R. at 277.) On November 3, 2004, Herring noted that Citarelli had an irritable mood and blunted affect, and she encouraged compliance with services. (R. at 175.) Citarelli reported that she was taking her medications as ordered. (R. at 175.) On November 16, 2004, Citarelli again saw Dr. M.R. Patel, who assessed her comprehension as intact and diagnosed chronic anxiety-depression. (R. at 276.) On November 29, 2004, Dr. Gee indicated that Citarelli's mood was "ok" with a congruent affect. (R. at 387.) He deemed her concentration and memory as good, but her judgment and insight as limited. (R. at 387.) Dr. Gee diagnosed chronic PTSD, major depressive disorder, recurrent type, and borderline personality disorder.

-10-

(R. at 387.)

On December 14, 2004, Citarelli's mood and affect were normal, and she stated that she was "ok." (R. at 336.) Herring noted that Citarelli was marginally compliant with services, as she required a lot of calling to remind her of appointments. (R. at 336.) On January 13, 2005, Citarelli exhibited an angry mood and normal affect, and she reported continued moodiness and irritability. (R. at 337.) She stated that there was no way that she could work due to her difficulty with people and coping with the public. (R. at 337.) Citarelli again reported that she was taking her medications as ordered. (R. at 337.) Herring indicated that Citarelli was compliant with services that month, but noted that she called her the previous day to remind her of the appointment. (R. at 337.) That same day, Citarelli saw Dr. H.J. Patel with complaints of depression, generalized anxiety disorder and panic attacks. (R. at 349.) Dr. H.J. Patel diagnosed generalized social anxiety disorder with depression. (R. at 349.) She was advised to follow with a doctor at CMCS. (R. at 349.)

On February 4, 2005, Citarelli again saw Dr. M.R. Patel, who found her comprehension intact. (R. at 275.) Citarelli was diagnosed with, among other things, chronic anxiety-depression. (R. at 275.) That same day, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Citarelli suffered from an affective disorder and an anxiety-related disorder, but that a residual functional capacity assessment was necessary. (R. at 283-95.) On February 14, 2005, Citarelli saw Emalene Cook, an FNP at CMCS. (R. at 386.) She reported conflict with her oldest daughter and stated that she was feeling irritable and down. (R. at 386.) Cook noted that Citarelli's mood was euthymic and

-11-

her affect blunted, but her memory and concentration were deemed intact. (R. at 386.) Citarelli's diagnoses remained unchanged. (R. at 386.)

On February 15, 2005, Citarelli had a normal mood and blunted affect. (R. at 338.) She reported taking her medications as ordered, and Herring encouraged compliance with services. (R. at 338.) On March 11, 2005, Citarelli noted continued social and family stressors. (R. at 339.) She reported taking her medications as ordered, and Herring reported that Citarelli had been compliant with case management that month. (R. at 339.) That same day, Citarelli saw Dr. H.J. Patel with complaints of generalized anxiety disorder, panic attacks and bipolar disorder, among other things. (R. at 351.)

On March 21, 2005, Dr. Minaben D. Patel, M.D., a psychiatrist, performed a psychiatric evaluation of Citarelli at the referral of Disability Determination Services. (R. at 298-303.) Citarelli stated that she was not able to work because she "stay[ed] too stressed out." (R. at 298.) She reported that her medications were not helping her at all. (R. at 299.) Citarelli stated that she spent most of the day around her house, reporting that she sometimes performed housework, but that her daughter did most of it. (R. at 300.) She stated that she prepared some food for her children, watched some television and visited her mother. (R. at 300.) Citarelli stated that she had no friends. (R. at 300.) She reported that she sometimes went to the store, but did not attend church. (R. at 300.) She further reported her involvement with counseling, but stated that it was not helping her. (R. at 301.) Dr. Minaben Patel diagnosed dysthymic disorder, chronic, moderately severe, generalized anxiety disorder, rule out PTSD, and

assessed a then-current Global Assessment of Functioning, ("GAF"), score of 55.[6] (R. at 302-03.) Dr. Minaben Patel noted that Citarelli appeared to be quite depressed at the time of the interview and strongly recommended that she continue psychiatric treatment. (R. at 303.) Dr. Minaben Patel opined that because Citarelli did not want to be associated with people and felt quite bitter toward people in general, she would have a lot of difficulty being with people or working around people or working under people. (R. at 303.) He further opined that she would have difficulty with complex instructions and with completing a full workday. (R. at 303.)

On April 8, 2005, Jennings completed a Mental Residual Functional Capacity Assessment, finding that Citarelli was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to set realistic goals or make plans independently of others. (R. at 304-07.) She found no evidence of limitation in Citarelli's ability to

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

-13-

maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 305.) Jennings found that Citarelli was not significantly limited in the remainder of work-related mental activities. (R. at 304-05.) Thus, Jennings concluded that despite moderate restrictions, Citarelli could perform simple, unskilled nonstressful work. (R. at 306.) Her symptoms were considered partially credible. (R. at 306.) These findings were affirmed by Eugenie Hamilton, Ph.D., another state agency psychologist, on June 13, 2005. (R. at 306.)

The same day, Jennings completed a PRTF, finding that Citarelli suffered from an affective disorder and an anxiety-related disorder, but that a residual functional capacity assessment was necessary. (R. at 308-21.) Jennings found that Citarelli was moderately restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and that there was insufficient evidence to determine whether Citarelli had experienced repeated episodes of decompensation. (R. at 318.)

On April 12, 2005, Citarelli saw Dr. H.J. Patel with complaints of an anxiety disorder, panic attacks and bipolar disorder. (R. at 352.) On April 14, 2005, Citarelli missed her counseling appointment, stating that she forgot it. (R. at 340.) On April 22, 2005, she had an anxious mood and normal affect. (R. at 341.) Citarelli reported taking her medications as ordered, but she stated that they made her feel "dragged out" without helping her feelings of depression. (R. at 341.) Herring indicated that Citarelli was compliant with services. (R. at 341.)

On May 16, 2005, Dr. Gee diagnosed PTSD, chronic, and major depressive

-14-

disorder, recurrent type. (R. at 343, 382.) He noted that Citarelli had a "tough situation, very dysfunctional family situation. Makes poor decisions to help herself." (R. at 343, 382.) The same day, Herring noted that Citarelli had a frustrated mood with a normal affect. (R. at 342, 378.) Citarellii reported that she could not work due to difficulty concentrating and dealing with the public. (R. at 342, 378.) She stated that her mother was taking her to Maryland the following month for her son's graduation. (R. at 342, 378.) Herring gave Citarelli information on anger management and relaxation and encouraged her to apply those techniques. (R. at 342, 378.) She noted that Citarelli was compliant with all services. (R. at 342, 378.) On June 7, 2005, Herring described Citarelli's mood as normal and her affect as blunted. (R. at 377.) Citarelli stated that she had not read the information Herring had given to her the previous month, but that she planned to do so. (R. at 377.) She reported taking her medications as ordered, and Herring noted that she was compliant with all services. (R. at 377.)

On July 14, 2005, Citarelli complained to Dr. H.J. Patel of an anxiety disorder and panic attacks, among other things. (R. at 355.) When Citarelli missed her July 18, 2005, appointment, Herring called her and left a message in an effort to schedule a home visit. (R. at 375-76.) Citarelli did not return Herring's call. (R. at 375.) When Herring arrived at Citarelli's home, she was leaving, stating that she was upset about the home visit on short notice. (R. at 375.) She stated that she had to pick up her daughter from 4-H camp and that she had to get some bug spray because she had ants. (R. at 375.) Citarelli reported taking her medications as ordered, and Herring indicated that she continued to be in need of services at CMCS. (R. at 375.) On August 15, 2005, Citarelli reported a nervous mood. (R. at 381.) Dr. Gee diagnosed

-15-

PTSD, chronic, and major depressive disorder, recurrent type. (R. at 381.) She was advised to continue Paxil, he increase her dosage of Seroquel, decreased her dosage of Cymbalta and added Vistaril. (R. at 381.) Citarelli asked for a "nerve pill," but Dr. Gee opined that benzodiazepines were not a "great plan." (R. at 381.) The same day, Citarelli saw Herring, stating that "nothing [had] changed." (R. at 374.) She reiterated that she did not want a home visit. (R. at 374.) She reported medication compliance, and Herring opined that Citarelli continued to be in need of services from CMCS. (R. at 374.) On September 16, 2005, Citarelli's mood and affect were deemed to be "ok." (R. at 373.) Herring discussed socialization with Citarelli and gave her information regarding the public library's fall activities schedule. (R. at 373.) She reported medication compliance, and Herring indicated that Citarelli was compliant with case management and continued to need it. (R. at 373.)

On October 13, 2005, Citarelli stated that she had "all kinds of problems," and Herring noted a blunted affect. (R. at 372.) Herring noted that Citarelli forgot easily and lost things, and she discussed organizational skills with her. (R. at 372.) Citarelli reported medication compliance, but stated that they did not help enough. (R. at 372.) Herring indicated that Citarelli was compliant with services at CMCS. (R. at 372.) The next day, Dr. H.J. Patel completed a Medical Evaluation, opining that Citarelli was unable to work, and would be so for more than 90 days, partially due to PTSD with depression and severe generalized social anxiety with panic attacks. (R. at 366-67.) On November 21, 2005, Citarelli noted that although Vistaril made her "more energetic," she experienced continued anxiety on a regular basis. (R. at 380.) Dr. Gee diagnosed PTSD, chronic, and major depressive disorder, recurrent type. (R. at 380.) He discontinued Vistaril and increased Citarelli's dosage of Seroquel, stating that he

-16-

would continue to adjust Citarelli's medications to help with her symptoms.  (R. at 380.)  The same day, Citarelli reported that she was "ok."  (R. at 371.)  Her affect was flat, and she reported medication compliance.  (R. at 371.)  Herring noted that Citarelli was compliant with services.  (R. at 371.)  On January 5, 2006, Citarelli stated that she was "not doing good," noting that she did not feel like doing anything.  (R. at 370.)  She stated that the Seroquel made her feel "tired and drug out."  (R. at 370.)  Herring indicated a normal mood with blunted affect, and she discussed setting everyday goals, such as walking and reading, but Citarelli stated she would not walk in the cold and that she did not like to read.  (R. at 370.)  Citarelli expressed worries about her ex-husband trying to see the children when he "got out" in June of that year.  (R. at 370.)  Herring indicated that Citarelli was compliant with all services.  (R. at 370.)

On February 13, 2006, Citarelli again saw Cook, noting that her mood was "about the same."  (R. at 379.)  She stated that she liked to watch cartoons with her children.  (R. at 379.)  Cook reported that Citarelli had a mildly depressed mood with a blunted affect, and her diagnoses remained unchanged.  (R. at 379.)  She also saw Herring on that day, who noted a normal mood and blunted affect.  (R. at 369.)  Citarelli again reported medication compliance.  (R. at 369.)  When asked about considering "clubhouse,"[7] Citarelli refused, stating that she did not like to socialize.  (R. at 369.)  Herring indicated that Citarelli was compliant with all services.  (R. at 369.)  That same day, Dr. H.J. Patel completed a Medical Evaluation, opining that Citarelli would be unable to work for six months, partially due to her generalized social anxiety disorder with depressive mood disorder, as well as PTSD.  (R. at 384-

---

[7]There is no explanation contained in the record as to what exactly is meant by "clubhouse."

85.) He noted limitations in Citarelli's cognition and interpersonal relationships with co-workers. (R. at 385.) Dr. H.J. Patel reported that, although Citarelli was compliant with medication and medical services, her condition hindered her ability to care for her children. (R. at 385.) He further opined that Citarelli required additional evaluation and/or assessment by a psychiatrist, psychologist or other mental health provider in order to determine her current and/or future work capacity. (R. at 385.)

## II. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in

the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 17, 2006, the ALJ denied Citarelli's claim. (R. at 17-26.) The ALJ found that the medical evidence established that Citarelli had severe impairments, namely a back disorder, hypertension, hyperlipidemia, GERD, depressive disorder, PTSD, generalized anxiety disorder and a history of headaches, but he found that Citarelli did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-22.) The ALJ found that Citarelli had the residual functional capacity to perform a significant range of light work that allowed for occasional bending, stooping and crawling, but he found that she should avoid climbing, heights, moving machinery, contact with the public and complex/detailed tasks. (R. at 23.) Although the ALJ found that Citarelli could return to her past relevant work as a packer, he further found that she could perform the jobs of an office cleaner, a food preparation worker, a survey worker and a telemarketer, all at the light level of exertion. (R. at 25-26.) Therefore, the ALJ concluded that Citarelli was not under a disability as defined in the Act, and that she was not eligible for SSI benefits. (R. at 26.) *See* 20 C.F.R. § 416.920(f)-(g) (2007).

In her brief, Citarelli argues that the ALJ erred by failing to consider the most recent records from CMCS regarding her mental impairments. (Plaintiff's Brief at 5-7; Plaintiff's Response Brief In Opposition To Defendant's Motion For Summary Judgment, ("Plaintiff's Response"), at 1-3.) Citarelli also argues that the ALJ's

analysis of the evidence of her mental impairments was "irrational." (Plaintiff's Brief at 8-9; Plaintiff's Response at 3-4.) Finally, Citarelli argues that the ALJ's analysis of her activities of daily living was faulty. (Plaintiff's Brief at 9-10; Plaintiff's Response at 4-5.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Citarelli first argues that the ALJ erred by failing to consider the most recent

-20-

records from CMCS regarding her mental impairments. More specifically, she contends that the ALJ erred by failing to consider the records from CMCS dated May 16, 2005, through February 13, 2006. Citarelli contends that these records undermine the ALJ's finding that she was noncompliant with treatment, which further undermines his notion that had she been compliant, her mental impairments would have responded to that treatment and improved. Citarelli argues that, despite her compliance, she continued to need therapy and medication for her depression, anxiety and PTSD, thereby directly contradicting the ALJ's statements. Moreover, Citarelli notes that the ALJ mentioned these most current records only one time in his decision, but the reference thereto was a faulty one, in that he stated that in August 2005 "Behavioral Management Techniques were discussed." Citarelli argues that this simply is incorrect. Thus, Citarelli contends that because the ALJ failed to discuss this evidence, there is no way to determine how much weight, if any, he accorded it. She further contends that the ALJ abdicated his duty to resolve this conflict in the evidence.

It is well-settled that an ALJ has a duty to analyze all of the relevant evidence and sufficiently explain his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an

abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Although Citarelli is correct that the ALJ did not include an in-depth analysis of these most recent records from CMCS in his decision, he clearly considered them in reaching his conclusions. Specifically, the ALJ referred to Exhibits B-4F, B-28F and 30-F after discussing the evidence regarding Citarelli's mental health treatment from CMCS. (R. at 21.) Exhibit B28F contains the records from May 16, 2005, through February 13, 2006, the very records Citarelli claims were not considered by the ALJ. Moreover, the ALJ's statement that "Behavioral Management Techniques were discussed," is a separate sentence, not necessarily related to the prior sentence referencing August 2005. Thus, while the August 2005 notes from CMCS do not specifically mention behavioral management techniques, treatment notes from other dates do. For instance, on May 16, 2005, Herring provided information on anger management and relaxation and encouraged Citarelli to apply those techniques. (R. at 342, 378.) Likewise, on September 16, 2005, Herring discussed socialization with Citarelli and provided information regarding the public library's fall activities schedule. (R. at 373.) On October 13, 2005, she discussed organizational skills with Citarelli, and on January 5, 2006, she encouraged Citarelli to set everyday goals such as walking and reading. (R. at 370, 372.) Finally, on February 13, 2006, Herring encouraged Citarelli to attend "clubhouse." (R. at 369.) For all of these reasons, the court finds Citarelli's argument that the ALJ failed to consider the most recent records from CMCS to be without merit. Likewise, the court finds her argument that the only

-22-

reference to these records was inaccurate also to be without merit.

Even assuming that the ALJ erred by failing to explicitly state whether he was accepting or rejecting these treatment notes from CMCS, any such error is harmless, thereby not requiring the case to be remanded. An error is harmless in a social security case when it is inconceivable that a different administrative conclusion would have been reached absent the error. *See Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va. Oct. 18, 2007) (citing *Camp v. Massanari*, 2001 WL 1658913 (4th Cir. Dec. 27, 2001) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") Here, the only aspect of these most recent treatment notes from CMCS that Citarelli focuses on is that of compliance with treatment. She argues that the ALJ's findings that she was noncompliant with mental health treatment and that, if she had been compliant, her condition would have improved, are directly contradicted by these most recent treatment notes. Specifically, Citarelli contends that these notes show that, despite compliance, her condition did not improve.

Although Citarelli has validly pointed out that compliance does not appear to have been an issue over this most recent time period, thereby countering the ALJ's notion that her condition would have improved had she been compliant, the court notes that compliance was only one factor the ALJ considered in finding that Citarelli's mental impairments were not disabling. I further note that the ALJ probably should not have asserted his opinion that mental impairments generally

-23-

improve with treatment. However, Citarelli's claim before this court turns on whether substantial evidence of record supports the ALJ's disability determination, not the propriety of this one finding made by the ALJ. For the reasons that follow, I find that the ALJ's finding that Citarelli did not suffer from disabling mental impairments is supported by substantial evidence.

The record reveals that Citarelli suffers from mental impairments, including PTSD, major depressive disorder, generalized social anxiety disorder and borderline personality disorder. However, the record also reveals that she suffers from no more than moderate limitations as a result of these mental impairments, just as the ALJ concluded. In November 2004, Dr. M.R. Patel reported that Citarelli's comprehension was intact, and Dr. Gee found her concentration and memory to be good, but her judgment and insight limited. (R. at 276, 387.) In February 2005, Dr. M.R. Patel again deemed Citarelli's comprehension intact, and Cook deemed her concentration and memory intact. (R. at 275, 386.) In March 2005, Dr. Minaben Patel opined that Citarelli would have difficulty dealing with people or working around people and that she would have difficulty with complex instructions and with completing a full workday. (R. at 303.) In April 2005, state agency psychologist Jennings opined that Citarelli was no more than moderately limited in any area of work-related mental functioning. (R. at 304-07.) Jennings further opined that Citarelli was moderately restricted in her activities of daily living and experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 318.) Jennings concluded that, despite these moderate restrictions, Citarelli could perform simple, unskilled nonstressful work. (R. at 306.) On October 14, 2005, Dr. H.J. Patel opined that Citarelli would be unable to work for more than 90 days,

-24-

partially due to her mental impairments. (R. at 366-67.) Likewise, on February 13, 2006, Dr. H.J. Patel opined that Citarelli would be unable to work for six months, partially due to her mental impairments. (R. at 384-85.) He noted limitations on Citarelli's cognition and interpersonal relationships with co-workers. (R. at 385.) Dr. H.J. Patel further opined that Citarelli's condition hindered her ability to care for her children. (R. at 385.) He concluded that she needed further evaluation to determine her current and/or future work capacity. (R. at 385.)

As is apparent, Dr. H.J. Patel imposed the harshest restrictions on Citarelli's abilities. However, as the ALJ found, his findings simply are not supported by his own treatment notes or by the other substantial evidence of record. Dr. H.J. Patel is Citarelli's primary care physician. Thus, his treatment notes contain more than just notes regarding Citarelli's mental impairments. In fact, the majority of Dr. H.J. Patel's treatment notes center around her physical ailments, only briefly mentioning her mental impairments. Moreover, while Dr. H.J. Patel has diagnosed Citarelli with generalized social anxiety disorder with panic attacks, his treatment notes do not reflect that he performed any objective mental testing, mental status examinations, made any observations regarding her mental state, noted any restrictions on her activities or prescribed any medication for the treatment of her mental impairments. At most visits, Dr. H.J. Patel merely noted that Citarelli had a history of various mental impairments, or Citarelli herself noted that she was suffering therefrom without ever explaining her symptoms. (R. at 348-49, 351-52, 355.) Citarelli did relate some subjective complaints to Dr. H.J. Patel, including difficulty concentrating and becoming anxious in public. (R. at 344.) Dr. H.J. Patel essentially deferred Citarelli's mental health treatment to the counselors and psychiatrists at CMCS.

-25-

For these reasons, it is clear from the evidence contained in the record that Dr. H.J. Patel's opinions that Citarelli was unable to work for various periods of time, due at least partially to her mental impairments, are not supported by his own treatment notes. Additionally, these opinions are not supported by the other substantial evidence of record, including that from CMCS and the state agency psychologists, finding that Citarelli experienced, at most, moderate limitations as a result of her mental impairments and that, despite these limitations, she could perform simple, unskilled and nonstressful work that did not require contact with the public. In response to hypothetical questions which included all of these limitations, the vocational expert identified jobs existing in significant numbers in the national economy that such an individual could perform.

Therefore, for all of the above-stated reasons, the court finds that Citarelli's argument that the ALJ erred by failing to consider the most recent records from CMCS in rendering his decision regarding the effects of her mental impairments on her work-related abilities is without merit and that the ALJ's decision thereon is supported by substantial evidence.

Citarelli next argues that the ALJ erred by failing to consider her testimony regarding her family's history of sexual abuse and its effects on her work-related abilities. She contends that it was imperative for the ALJ to consider the cause of her PTSD diagnosis because a lack of evidence explaining the diagnosis could have led the medical expert to question the diagnosis or the ALJ to find the testimony incredible. Citarelli further argues that the ALJ erred by failing to consider this evidence of abuse because her testimony about its impact on her ability to function,

if believed, would have supported a finding that her mental impairments were more severe than the ALJ found them to be. However, because he did not mention this evidence, Citarelli contends that it is impossible to determine what weight he accorded it. She argues that remand is necessary so that this evidence can be evaluated in conjunction with the other evidence in the record. For all of the reasons set forth below, I find Citarelli's argument meritless.

I first note that the record is replete with treatment notes discussing Citarelli's history of sexual abuse and her subjective allegations of its effect on her. It also is apparent from the record that at least one mental diagnosis resulting from these events is PTSD. Thus, the ALJ was acutely aware of the reason for such diagnosis. As the Commissioner argues in his brief, it is the diagnosis and accompanying limitations that are crucial to the ALJ's determination regarding the severity of Citarelli's mental impairments and their effect on her ability to work. The court further notes that Citarelli's contention that the medical expert might have questioned the PTSD diagnosis without a sufficient explanation therefor, is without merit. Only a medical expert, not a psychological expert, testified at Citarelli's hearing. This medical expert rendered opinions only on Citarelli's physical ailments and limitations. He rendered no opinions regarding the severity of her mental impairments or their effect on her work-related abilities. As for Citarelli's credibility argument, the court emphasizes that credibility determinations are for the ALJ to make. *See* 20 C.F.R. § 416.929 (2007); *see also Hays*, 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. The ALJ need not explicitly address each and every step of his credibility analysis, as Citarelli would like for the court to believe. Here, it is sufficient that the ALJ noted in his decision that he had considered all symptoms and the extent to which they could reasonably be

accepted as consistent with the objective medical evidence and other evidence. (R. at 23.) The ALJ further stated that Citarelli's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that her statements concerning the intensity, duration and limiting effects of these symptoms were not entirely credible. (R. at 23.) Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). Furthermore, and ALJ's assessment of a claimant's credibility regarding the severity of pain and symptoms is entitled to great weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

The court finds clear that the ALJ simply made a credibility determination after considering Citarelli's testimony regarding the impact that her family's history of sexual abuse had on her ability to work. The court further finds that such determination is supported by the record as evidenced by the limitations imposed by Citarelli's treating mental health sources as well as the state agency psychologists. For all of the above-stated reasons, I find that the ALJ did not err by not considering Citarelli's testimony regarding the effects of her family's history of sexual abuse. Instead, the ALJ did consider her testimony and made a credibility determination that is supported by the record.

Lastly, Citarelli argues that the ALJ erred by overstating her ability to perform activities of daily living. Specifically, she argues that the ALJ rejected her testimony on the subject in favor of other statements contained in the record and that the ALJ focused only on the accounts of her activities that were most favorable to his finding.

-28-

Citarelli testified that she did not get dressed approximately four days per week. (R. at 433.) She stated that she could take care of her personal needs, that she awakened her children for school, but that they were old enough to get themselves ready, that she vacuumed and dusted a little bit, but that her daughter performed most of the household chores, that she prepared "easy" meals for her lunch, that she did not attend church services or engage in any of her children's school activities, that she grocery shopped with her aunt and daughter, but that her daughter prepared the shopping list, that she did not visit others or have any hobbies, that she seldom drove and that her mother paid her bills for her due to memory problems. (R. at 433-35.) In his decision, the ALJ noted some of Citarelli's testimony, including that her daughter performed most of the housework, her mother paid her bills, that she had no hobbies or friends and that she seldom drove a vehicle. (R. at 20.) Later in his decision, the ALJ stated that the evidence demonstrated that Citarelli could concentrate well enough to make decisions, watch television, shop, read materials and cooperate throughout interviews. (R. at 23.) He further stated that the evidence showed that she could complete household chores, take care of her personal needs, grocery shop, run errands, prepare meals, visit friends and relatives and talk on the telephone. (R. at 23.)

While it is true that the ALJ's findings regarding Citarelli's activities was somewhat more expansive that her testimony would suggest, it, nonetheless, is supported by other substantial evidence of record. For instance, it is clear from the volume of treatment notes that Citarelli was getting dressed and attending numerous medical appointments. There also is only one indication in the record that she was

-29-

being driven to these appointments by anyone else.[8]  When Herring attempted an unexpected home visit, Citarelli was on her way out to pick up her daughter from 4-H camp and to buy bug spray.  Furthermore, while Citarelli testified that she did not get her children ready for school, she did not state that she could *not* do so, but simply stated that they were old enough to do it themselves.  As the Commissioner contends, Citarelli provided information regarding her activities to various medical sources that contradicts her testimony.  For instance, on a Function Report, dated November 19, 2004, Citarelli reported that she could prepare sandwiches, frozen food and soups, that she made trips twice monthly to the grocery store, that she made trips to the convenience store, that she could count change, handle a savings account and use a checkbook/money orders and that she did not have difficulty completing tasks or understanding or following instructions. (R. at 94-97.)  In March 2005, Citarelli informed Dr. Minaben Patel that she performed housework when she felt like it, she could fix some food for her children, she watched some television, she visited her mother and she sometimes went to the store.  (R. at 300.)  In May 2005, she informed Dr. Herring that she was preparing to take a trip to Maryland for her son's graduation the following month. (R. at 342, 377.)  She testified at her hearing that she did, in fact, make this trip. (R. at 437.)  Finally, the state agency psychologists found that she was no more than moderately restricted in her activities of daily living.  (R. at 318.)  For all of these reasons, I find that substantial evidence supports the ALJ's analysis of Citarelli's activities of daily living.

---

[8]The treatment notes from Citarelli's consultative evaluation by Dr. Minaben Patel indicate that she was driven by her aunt's boyfriend.  (R. at 298.)

-30-

*III. Conclusion*

For the foregoing reasons, Citarelli's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.  I further deny Citarelli's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

DATED:       This 5th day of June 2008.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE